In the Matter of HONEOYE CENTRAL SCHOOL DISTRICT et al., Appellants, v PETER A. A. BERLE, as Commissioner of Environmental Conservation of the State of New York, et al., Respondents.

In the Matter of TOWN OF CANADICE et al., Appellants, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION et al., Respondents.

Fourth Department, December 21, 1979

APPEARANCES OF COUNSEL

*Nixon, Hargrave, Devans & Doyle (Robert G. Harvey, John B. Hood* and *Thomas D. Lustig* of counsel), for Honeoye Central School District and another, appellants.

*Levy, Feldman & Licata, P. C. (David Levy* of counsel), for Town of Canadice and others, appellants.

*Robert Abrams, Attorney-General (Peter G. Crary, Jeremiah Jochnowitz* and *Francis J. Keehan* of counsel), for Peter A. A. Berle and another, respondents.

*Louis N. Kash, Corporation Counsel (Susan L. Hauser* of counsel), for City of Rochester, respondent.

OPINION OF THE COURT

HANCOCK, JR., J.

For more than 100 years, two lakes, Hemlock and Canadice, in the highlands south of the City of Rochester, have furnished a substantial part of the city's water requirements. The lakes and the surrounding 7,343 acres of wooded watershed area in Livingston and Ontario Counties, acquired by the city through condemnation pursuant to statute (L 1872, chs 387, 771, § 22; L 1873, ch 754) constitute Rochester's "Upland Water Supply Watershed Area." The Rochester watershed area, although owned by the city, has never enjoyed a tax exemption,[1] and the various municipal corporations (including

---

1. The taxability of the City of Rochester's "Upland Water Supply Watershed Area" has been previously litigated in *City of Rochester v Union Free School Dist. No. 4 of Town of Livonia* (255 App Div 96, affd 280 NY 531). There the city argued that the exemption from taxation accorded by General Municipal Law (§ 411) to property and revenue of a municipally owned undertaking should apply to the city's reservoirs, pipe lines and other facilities located outside the city's boundaries acquired and constructed in the development of a municipal water supply system. The court held

the petitioning towns and school district in which the land lies) have taxed it as privately owned property. The instant controversy stems from Rochester's efforts to achieve a partial tax exemption for a substantial part of its watershed lands as forest lands qualifying under New York Real Property Tax Law (§ 480-a, added by L 1974, ch 814, as amd by L 1975, ch 68; L 1976, ch 422; and L 1976, ch 526).

The Legislature created the tax exemption for forest lands in 1974. After postponements and amendments (L 1975, ch 68; L 1976, chs 422, 526) it became effective on July 1, 1977. As the statute read at the time of Rochester's application in 1978 it provided for a tax exemption for eligible tracts of forest land, defined as "land *exclusively devoted to and suitable for* forest crop production" (Real Property Tax Law, § 480-a, subd 1, par [b]; emphasis added). The section prescribed a complex procedure for the approval of an eligible tract by the Department of Environmental Conservation which included the submission of a forest management plan by the owner.[2]

The City of Rochester submitted to the Department of Environmental Conservation an initial draft of a forest management plan concerning the watershed area on March 3, 1978. When it filed its applications for certificates of approval on April 14, 1978, the city submitted a revised management plan. On April 25, 1978 the department filed its official rules and regulations (6 NYCRR Part 199), effective immediately, implementing Real Property Tax Law (§ 480-a). On the same day, the department officially accepted the city's applications for tax exemption pursuant to that statute. One day later—

that section 411 was intended by the Legislature to exempt only property and revenue related to an undertaking by a municipality which was in strict accord with the provisions of article 14-C of the General Municipal Law, the requirements of which were not met by the city's acts in connection with the property for which it sought exemption. The court added that courts favor tax exemption only where the purpose of the statute clearly indicates legislative intent to exempt. The court also rejected the city's contention that article 14-C repealed by implication the basic provision of subdivision 3 of former section 4 of the Tax Law by which municipally owned property located outside the corporate limits was made taxable. The court restated the general State policy not to exempt municipally owned property not located within the municipality.

2. Prior to the 1976 amendment (L 1976, ch 526), section 480-a contained less stringent eligibility requirements. Absent were the requirements that to be eligible the tract be *"exclusively* devoted" to forest crop production and that a management plan be submitted. In 1979, subsequent to the city's application, section 480-a was amended to contain a provision expressly eliminating application of the section to municipally owned property (L 1979, ch 683, § 2).

April 26, 1978—the city received the final certificates of approval which are the subject of the litigation before us.

Petitioners brought CPLR article 78 proceedings in August, 1978 seeking, *inter alia,* annulment of the certificates of approval. Special Term dismissed the petitions holding that municipally owned forest lands were eligible for exemption under section 480-a and that the primary use of the land as a watershed area in connection with the city's water supply was not a bar to the city's application despite the restrictive language limiting eligible lands to lands "exclusively devoted to and suitable for" forest crop production.

On appeal, petitioners argue first that the City of Rochester cannot qualify under section 480-a as "an owner of an eligible tract" for the "Upland Water Supply Watershed Area" within the meaning of the term as intended by the Legislature. Secondly, petitioners urge that even if the watershed lands were within the purview of the statute, Special Term erred in not vacating the action of the Department of Environmental Conservation in approving the city's applications for certification as arbitrary and capricious and contrary to law.[3] Because, for reasons which appear hereafter, we hold that Rochester's "Upland Water Supply Watershed Area" is not an eligible tract under section 480-a, we do not reach this second question.

■ Before we turn to an analysis of the statute we observe that section 480-a of the Real Property Tax Law is tax exemption legislation. It is well established that "exemptions from taxation should be strictly construed and, if there be any ambiguity, 'all doubt must be resolved against the exemption' " *(Matter of Aldrich v Murphy,* 42 AD2d 385, 388, quoting *Matter of City of Lackawanna v State Bd. of Equalization & Assessment of State of N.Y.,* 16 NY2d 222, 230; see *Matter of Young v Bragalini,* 3 NY2d 602, 605-606).

---

**3.** Essentially, petitioners contend: that the Department of Environmental Conservation did not notify and consult with other involved agencies as required by 6 NYCRR 617.5 (b) (eff Jan. 24, 1978); that neither the city nor any other agency had made the early determination concerning the necessity of an environmental impact statement required by Environmental Conservation Law (§ 8-0109, subd 4); that the department contravened 6 NYCRR 617.5 (d) (eff Jan. 24, 1978) by failing to make a "lead agency" determination within 30 calendar days after initial receipt of the city's application; that the department's conduct in making extensive revisions in the city's forest management plan to avoid the necessity for an environmental impact statement and to justify its issuance of a negative declaration was improper; and that the department's issuance of a negative declaration with respect to the city's forest management plan was arbitrary and capricious and an abuse of its discretion.

Applying this rule of strict construction, we hold that the Legislature did not intend that a municipality could qualify under 480-a for a tax exemption as an "owner of an eligible tract" for property outside its limits used primarily for water supply purposes. There are two reasons.

I

First, the legislative purpose in enacting section 480-a of the Real Property Tax Law was to benefit private landowners actively engaged in forest crop production—a class which would exclude municipalities. We base our conclusion on an interpretation of the statute and the relevant legislative documents at the time of its original enactment in 1974 and on subsequent legislative actions pertaining to section 480-a in 1975, 1976, and 1979 which confirm this interpretation.

We examine the statute as originally passed in 1974 (L 1974, ch 814). The Legislature in enacting section 480-a in 1974 stated in its "Legislative findings and declaration of purpose": "[L]ands presently devoted to growth of forest crops are often assessed at a level which renders continued dedication to such use uneconomical. * * * [U]se of land for timber production is becoming increasingly economically unfeasible due to assessment practices which do not take into account the present use of the property being assessed. Lands devoted to growth of forest products should be assessed at a level which recognizes this use rather than at a level reflecting devotion of the land to another purpose. It is the purpose of this chapter to provide a means by which present and future forest lands may be protected and enhanced as a viable segment of the state's economy". Although the "Legislative findings and declaration of purpose" does not refer expressly to private owners, it is evident that the legislation was passed for the purpose of encouraging present and prospective timber producers in the State to devote their land to the growth of forest products by providing reductions of land assessments to a level where commercial forest production would be economically feasible. There is no question that the sponsors of this legislation understood it to be a measure designed to foster commercial timber production and related industries[4] and a

4. The memorandum of the New York State Forest Practice Board (NY Legis Ann, 1974, pp 271-272) in support of the enactment of the original section 480-a (L 1974, ch 814) lists among the sponsors of the bill the New York State Forest Owners Associa-

law intended "for the benefit of the private forest landowner."[5]

Although section 480-a as originally drawn did not specifically limit its application to private landowners, there are provisions in the statute (e.g., the definition of forest land as land "devoted to and suitable for forest crop production"; the requirement that an application for certification shall include a statement that the eligible tract shall be used for forest crop production for a minimum period of eight years; and the provisions for direction by the department that the owner make a harvest cutting and for penalties if the owner does not do so) which support the conclusion that the legislation contemplated an owner who was or could become actively engaged in commercial forest crop production.

Subsequent legislative enactments in 1975 and 1976 confirm this interpretation. The statute as originally passed, it was discovered, had not accomplished what the Legislature had intended. Instead of clearly limiting the tax exemption to owners actively engaged in forest crop production the statute was susceptible of a construction which would permit exemptions for a wide variety of landowners whom the Legislature had not meant to benefit. Accordingly, the Legislature postponed the effective date of the exemption for two years (L 1975, ch 68; L 1976, ch 422)[6] for the purpose of drafting the bills which ultimately resulted in a substantial revision of the statute in 1976 (L 1976, ch 526) designed to cure its deficiencies. The Governor in his memorandum supporting the 1976 amendment explained that the original provisions of 480-a "were so loosely drawn that it became apparent that the tax

tion, the State University College of Forestry, and the Association of American Foresters, New York State Section. The memorandum, stressing the importance of forest-related industries to the economy of the State of New York, states: "The commercial forest lands are held by over 250,000 landowners. In 1967, New York's civilian work force was 8 million persons. Employment in the timber-related industries amounted to about 1.4 million workers earning about $2.0 billion in wages."

**5.** The New York State Forest Practice Board stated that the purpose of section 480-a was to update the provisions of the Real Property Tax Law "for the benefit of the private forest landowner and the people of the State" (Memorandum of New York State Forest Practice Board, NY Legis Ann, 1974, p 271).

**6.** On May 6, 1975 the Legislature postponed the effective date of the statute by making it applicable only to properties with taxable status dates occurring on or after July 1, 1976 (L 1975, ch 68, § 1). In 1976 the Legislature again postponed the effective date, making the statute applicable only to properties with taxable status dates occurring on or after July 1, 1977 (L 1976, ch 422). (See *Matter of Neuner v Weyant,* 63 AD2d 290, 295-296.)

exemption might be taken advantage of by developers, real estate speculators, rod and gun clubs and large estate owners, and *not just timber producers"* (NY Legis Ann, 1976, p 397; emphasis added). To accomplish the intended restriction of the exemption to "just timber producers," the Legislature amended the statute in several particulars including, most importantly, the addition of the word "exclusively" to the definition of forest land so that an eligible tract had to be "land *exclusively* devoted to and suitable for forest crop production" (Real Property Tax Law, § 480-a, subd 1, par [b], as amd by L 1976, ch 526; emphasis added). It also increased the number of years that an owner would have to "commit" his land to "continued forest crop production" from 8 years to 10 and added the requirement that the commitment be made every year. The penalty for conversion from forest crop to other use was increased. Finally, the amendment imposed a new and additional burden on the owner—that of agreeing with the Department of Environmental Conservation on a plan "for the management of the eligible tract * * * [containing requirements and standards] deemed necessary by the department for the continuing production thereon of *marketable forest crops, including * * * stocking, cutting and access requirements"* (Real Property Tax Law, § 480-a, subd 2, as amd by L 1976, ch 526; emphasis added).

Once again in 1979 the Legislature amended section 480-a (L 1979, ch 683), this time in an obvious reaction to the opinion in this case at Special Term and to the departmental interpretation of the word "owner" as including a public corporation (specifically a municipality) as contained in 6 NYCRR 199.1 (o), (p). There can be no doubt that the purpose of the amendment was to state expressly and unequivocally what we perceive to have been the clearly implied legislative intent: that the exemption was for the benefit of private owners, not public corporations or municipalities.[7] The Legislature supplied the specific limitation that had been omitted and narrowed the definition of "eligible tract" so that it included only tracts of *"privately* owned forest land" (L 1979, ch 683, § 2; emphasis added). The amendment, although enacted as a general law, contained provisions which can only be

---

**7.** See New York State Assembly Memorandum in Support of Legislation (A 2706 [1979]) which states: "This bill intends to prohibit municipalities which own forest land outside their boundaries and have not had those lands certified by DEC prior to May 1, 1979 as an eligible tract from receiving a forest land tax exemption."

interpreted as special legislation for the benefit of Rochester and possibly Middletown. An exception (in the nature of a "grandfather clause") was made for "forest land which [was] owned by a municipal corporation and which was first certified as an eligible tract by the department pursuant to this section no later than the first day of May, nineteen hundred seventy-nine and was found to be eligible for exemption pursuant to this section on the basis of an application filed no later than such date" (L 1979, ch 683, § 2).[8]

We view the 1979 amendment as clarifying legislation intended to remove any doubt that section 480-a as originally enacted in 1974 and later amended in 1975 and 1976 was for the benefit of private commercial forest crop producers and not municipalities and as a legislative statement repudiating the contrary interpretation of the statute in 6 NYCRR 199.1 (o), (p) and at Special Term. Our view of the 1979 amendment as corrective legislation is supported by the memorandum of a cosponsor, Assemblyman Emery (A. 2706 [1979]): *"When the tax exemption for forest land was originally passed, it was intended to apply to private landowners only.* Several large cities who own reservoirs and surrounding land in other municipalities have recently applied for forest tax exemption. The Department of Environmental Conservation has recently ruled that municipalities are eligible for such exemptions and has already granted exemptions to Rochester and Middletown. The use of the forest tax exemption to exempt land surround-

---

8. It appears that Rochester and Middletown were the only municipalities to receive certificates of approval from the Department of Environmental Conservation. The concomitant amendment of subdivision 3 of section 406 of Real Property Tax Law (L 1979, ch 683, § 1) is clearly intended to apply only to Rochester. It provides a special exemption from taxation for real property owned by a municipal corporation having "a population of two hundred twenty-five thousand or more but less than three hundred thousand used as a * * * water shed", provided the governing board of any municipal corporation in which the property is located shall so agree in writing. The population of the City of Rochester is approximately 260,000. The same amendment also added paragraph (g) to section 480-a which states that the provisions of section 480-a would not apply to a "municipal corporation which made an application to the department on or before May first, nineteen hundred seventy-eight for a certificate of approval * * * and thereafter voluntarily withdraws such application as provided by an agreement with a municipal corporation" pursuant to section 406 (L 1979, ch 683, § 3). In effect, section 1 of the amendment made it possible for Rochester and the municipalities in which the property was located to reach a settlement of the instant lawsuit by agreeing on a partial exemption of the property under section 406 of the Real Property Tax Law. Section 3 of the amendment was designed to facilitate such a settlement by allowing Rochester to withdraw its application under section 480-a without being subject to the conversion penalty which would otherwise be imposed.

ing reservoirs from taxation is clearly not in keeping with the purposes of this act, and represents an unfair burden on localities [emphasis added]."

■ It is significant that the amending legislation restricting the availability of the exemption to private owners followed closely upon the enactment of 6 NYCRR 199.1 (o), (p) and Special Term's decision in this case, both of which had construed the statute as applying to municipalities. Because the effective date of the statute had been postponed (L 1975, ch 68; L 1976, ch 422) to allow the extensive revisions adopted in the 1976 amendment (L 1976, ch 526), there had been no long continued course of action under the statute by State or local administrative officers which would be entitled to consideration by the court in construing the statute (see McKinney's Cons Laws of NY, Book 1, Statutes, § 129). The first notice to the Legislature that the statute was being construed to allow exemption for municipal lands was the Department of Environmental Conservation's promulgation of 6 NYCRR Part 199 on April 25, 1978. It appears that the first judicial decision adopting the department's construction was the decision in this case at Special Term on March 1, 1979. These circumstances leading to and surrounding the enactment of the amendment in 1979 clearly support the view that the 1979 amendment was intended not to effect any substantive change in the law but rather to rectify the misinterpretations in the departmental regulation and in the court's decision and to clarify the apparent ambiguities in the statute which have resulted in the controversy before us. It is an accepted rule of construction that an amendment following soon after a controversy has arisen as to the interpretation of the original act may be construed as explanatory of the ambiguities from which such controversy arose (see McKinney's Cons Laws of NY, Book 1, Statutes, § 193, subd b).

We may dismiss respondents' argument that the inclusion of the "grandfather clause" in the 1979 amendment which was obviously tailored for Rochester and possibly Middletown (i.e., permitting eligibility of a municipal tract first certified by May 1, 1979 and, with respect to Rochester only, allowing a special exemption under section 406 of the Real Property Tax Law) shows that the Legislature had from the inception of the legislation and until the amendment intended municipalities to be included. As we perceive it, the Legislature in the 1979 amendment declared that section 480-a had been initially and

was then intended only for private and not public landowners. For equitable or other reasons, the Legislature made special provisions to preserve whatever legal rights Rochester and Middletown might have acquired in receiving certification under a misinterpretation of the statute. A special exception to the general rule does not change the general rule. By the same token the Legislature's inclusion of permission for a special exception from what had been and continued to be its intended application of the statute does not obscure the message so plainly conveyed in the amendment when read in the light of the legislative history: that the Legislature from the inception of the statute had not intended to permit municipally owned tracts to qualify for the exemption.

## II

Even if one were to assume that a municipality could under some circumstances be owner of an "eligible tract," the Rochester "Upland Water Supply Watershed Area" could not qualify as land *exclusively* devoted to and suitable for forest crop production" (Real Property Tax Law, § 480-a, subd 1, par [b]; emphasis added). We need not labor the obvious point that the 7,343 acres which were acquired solely for watershed purposes and which have been used continuously for some 100 years for that purpose only cannot be lands devoted "exclusively" to a different use.

Our conclusion does not require that we construe the words "exclusively devoted to" as ruling out *any* other use. For, even adopting the meaning given to the word "exclusively" in cases involving charitable exemptions (i.e., "principally" or "primarily," see *Matter of Association of Bar of City of N. Y. v Lewisohn,* 34 NY2d 143, 153, and cases cited therein) we reach the same result, since the city concedes that the primary or principal use of the land is as watershed property.[9]

We reject the city's argument that the provision allowing "any use of the tract other than forest crop production which would be permitted as being *compatible with and supportive of such production"* (Real Property Tax Law, § 480-a, subd 2, as amd by L 1976, ch 526; emphasis added) relaxes the

---

9. In his affidavit in opposition to the petition, Sanford H. Vreeland, Superintendent of the Upland Water Supply for the City of Rochester, stated that the city's "primary consideration in the use and management of the watershed property has * * * always been and continues to be the preservation and promotion of the natural purity of the water of Hemlock and Canadice Lakes."

"exclusive use" requirement to the extent that land devoted primarily to water supply purposes may be eligible forest land. As pointed out in our discussion of whether the statute could apply to municipalities, the amendments of the statute both before and after Rochester's application show a definite legislative resolve to limit the scope of the statute to private landowners who would be actively engaged in timber production as the primary activity on their "eligible forest lands." In the context of the entire statute and its history and applying the canon of construction that all parts of a statute must be harmonized with each other and with the general intent of the whole statute (McKinney's Cons Laws of NY, Book 1, Statutes, § 98), we interpret the phrase "compatible with and supportive of" as used in subdivision 2 of section 480-a as permitting only those auxiliary uses which promote the principal use—forest crop production. As so construed, there is no conflict between the two provisions. (Cf. *Matter of Association of Bar of City of N. Y. v Lewisohn, supra,* p 153.)

■ Accordingly, Special Term should have granted the petitions to the extent of annulling the Department of Environmental Conservation's approval of Rochester's watershed area for exemption and declaring the City of Rochester not qualified as owner of an eligible tract of forest land under section 480-a of the Real Property Tax Law (as amd by L 1976, ch 526).

The judgments should be reversed, with costs and the petitions granted as stated herein.

CARDAMONE, J. P., SCHNEPP, CALLAHAN and MOULE, JJ., concur.

Judgments unanimously reversed, with costs and petitions granted in accordance with opinion by HANCOCK, JR., J.